Charles Warner Co., Successor to Penn Sand & Gravel Co., Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 5133. Promulgated October 31, 1927.

Discovery value for gravel deposit disallowed.

*William S. Hammers, Esq.*, for the petitioner.
*A. G. Bouchard, Esq.*, and *Granville S. Borden, Esq.*, for the respondent.

In this proceeding the petitioner seeks a redetermination of the income and profits-tax liability for the calendar years 1917, 1918, and 1919, for which the Commissioner has determined deficiencies in the amounts of $1,697.37 for 1917; $2,418.26 for 1918; and $568.69 for 1919. The petitioner alleges error on the part of the Commissioner in disallowing a value for discovery of a sand and gravel deposit, and depletion based thereon. It was conceded by counsel for petitioner at the hearing that discovery value does not apply to 1917.

FINDINGS OF FACT.

The Penn Sand & Gravel Co. was a Delaware corporation with its principal offices at 207 South Ninth Street, Philadelphia, Pa. The Charles Warner Co. is a Delaware corporation with its principal offices at Wilmington, Del. By purchases made at various times prior to December 30, 1924, the Charles Warner Co. became the sole owner of all of the shares of stock of the Penn Sand & Gravel Co., issued and outstanding. As the owner of such stock the Charles Warner Co. on December 31, 1924, acquired and took over all of the assets of the Penn Sand & Gravel Co., assumed the payments of all its outstanding liabilities, and caused the Penn Sand & Gravel Co. to be dissolved by mutual consent, in accordance with the laws of the State of Delaware, the certificate of dissolution being executed by the secretary of the State of Delaware on December 31, 1924.

In 1913 James A. Mundy inspected a real estate development known as Wheatsheaf Heights. This project appeared so attractive that he endeavored to purchase this property, known as the Starkey farm, from the promoters. In July, 1913, while negotiations were being carried on, Mundy obtained an option on a farm west of Wheatsheaf Heights, known as the Leland farm. In August, 1913, an option was secured on the Starkey farm. The option on the Leland farm was secured by a cash payment of $50, which applied as part of a first payment of $500 when an agreement of sale was executed. The total purchase price was $10,000, which was based on a price of $125 an acre. The option on the Starkey farm was secured by a cash payment of $100, which applied as part of a first payment of $1,000 payable when an agreement of sale was executed. The contract of sale of the Leland farm was executed August 25, 1913, and the contract of sale of the Starkey farm was executed September 13, 1913.

After securing the options Mundy and an associate visited the property and went to a location where a bungalow was being constructed. A well was being dug near by and Mundy discovered that a bed, or pocket, of gravel was exposed in the well and that the material was about 90 per cent stone and pebbles. Whereupon Mundy and associates proceeded to investigate the possibilities of converting this property into a gravel producer. With this in view a few test holes were put down which showed a good gravel with very little overburden. This exploration was not sufficiently thorough to warrant making a large investment but was considered sufficient to justify the formation of the company and the adoption of its name.

On September 9, 1913, a certificate of incorporation of the Penn Sand & Gravel Co. was filed in the office of the Secretary of State of the State of Delaware.

On October 29, 1913, an amended certificate of incorporation was drawn up and filed in the office of the Secretary of State at 11 a. m., October 30, 1913.

On October 29, 1913, the first meeting of the board of directors was held, and authority was given proper officers to carry out all necessary steps toward the exploitation of the gravel deposit, but such authority was qualified by the following resolution:

RESOLVED, that the proper officers be and they hereby are instructed to make a thorough investigation of the properties, before incurring any further liability, as to the class and quantity of material existing in the different properties, either by open pit work, drilling, or any other manner which in their judgment should be done; if it is necessary, to consult experts in this line of business. This is offered with a view of not going too far into it until the amount of material in the deposits is ascertained, before making any larger investments than are now made. The properties are farm properties and investigation or discovery has not been thoroughly made at the present time.

Under the authority granted by this resolution steps were taken to further explore the property, and 30 to 40 men were employed there during the winter of 1913 to 1914.

On November 3, 1913, the Starkey farm was bought by the Penn Sand & Gravel Co. for a consideration of $18,736.25. On December 18, 1913, the Leland farm was bought by the Penn Sand & Gravel Co. for a consideration of $10,000.

About April 16, 1914, sufficient exploration had been made to warrant the petitioner in entering into the business of producing and selling gravel and sand.

Prior to 1914 gravel had not been commercially exploited in·this region, although it was known to exist on these and other properties, as it appeared in places on the surface, had been used to repair roads, and had been uncovered by farmers in plowing the land in some sections where only about four inches of loam lay on top of the gravel. Deposits of sand were well known in this region and had been commercially exploited prior to 1914, particularly for molding purposes.

The petitioner's deposit of gravel was of exceptional quality in that it contained 90 per cent of gravel; it had very shallow overburden and was well located, both as to railroad facilities and distance from markets.

On April 16, 1914, the board of directors approved and accepted the subscription of Joseph J. Hock of Baltimore, Md., to 500 shares of capital stock of the company at par for cash.

At the time of organization of the Penn Sand & Gravel Co. the Seeley Engineering Co. subscribed for stock of the Penn Sand & Gravel Co. in the amount of $5,000. By August 3, 1914, only $515 had been paid on this subscription. On that date the board of directors of the petitioner met and authorized the issuance of stock to the Seeley Engineering Co. in the amount of $515, and further authorized the sale of $2,500 of the stock subscribed for by the Seeley Engineering Co. to the American Paving & Construction Co.

OPINION.

VAN FOSSAN: Petitioner claims a discovery value for a gravel deposit under favor of section 234(a)(9) of the Revenue Act of 1918, which provides for a reasonable allowance for depletion, and—

That in the case of mines, oil and gas wells, discovered by the taxpayer, on or after March 1, 1913, and not acquired as the result of purchase of a proven tract or lease, where the fair market value of the property is materially disproportionate to the cost, the depletion allowance shall be based upon the fair market value of the property at the date of the discovery, or within 30 days thereafter; * * *

After careful consideration of the record in this case we are unable to find evidence sufficient to enable us to determine the fair market

value of the gravel deposit or that the same was materially disproportionate to its cost.  There is no record of comparable sales at or about the same time or under similar circumstances, nor is the testimony as to royalty rates of any value in the absence of testimony of their relation to the value of the fee.  The fair market value of a gravel deposit depends so largely upon the peculiar factors obtaining in each particular case that the value of another deposit more than a hundred miles distant, located immediately adjacent to, or within, a large city where the land has great value for factory sites, facts in no wise comparable to petitioner's situation, is of little or no evidentiary weight in the instant case.  Petitioner has given us no criterion or measure by which we may judge the fair value of the land in question.

Furthermore, the record is silent as to the area of gravel-bearing land involved or the quantity of the gravel known to exist on the date of discovery or within 30 days thereafter.  It is also silent as to the cost of exploration, development, and exploitation of the alleged discovery.

With all of these data lacking it is impossible to determine the fair market value of petitioner's land or whether such value is in excess of its cost plus development expense.  It should be pointed out further that, were the value of the land ascertainable from the record, petitioner has failed to prove any basis for the computation of depletion.

In view of the above decision it is unnecessary to consider whether the gravel deposit was actually discovered by petitioner, as required by the statute, or whether, as a matter of law, a discovery value may ever be allowed on a gravel deposit.

*Judgment will be entered for the respondent.*

Considered by MARQUETTE, PHILLIPS, and MILLIKEN.